**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SOUTHCENTRAL FOUNDATION, *Plaintiff-Appellant*, v. ALASKA NATIVE TRIBAL HEALTH CONSORTIUM, *Defendant-Appellee.* | No. 18-35868 D.C. No. 3:17-cv-00018-TMB ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, Chief District Judge, Presiding

Argued and Submitted June 3, 2020
Seattle, Washington

Filed September 14, 2020
Amended December 21, 2020

Before: Ronald M. Gould, Carlos T. Bea, and
Mary H. Murguia, Circuit Judges.

Order;
Opinion by Judge Murguia

# SUMMARY[*]

## Tribal Health Services / Constitutional Standing

The panel filed:  (1) an order amending its opinion, denying a petition for panel rehearing, and denying on behalf of the court a petition for rehearing en banc; and (2) an amended opinion reversing the district court's dismissal for lack of standing of a tribal health organization's action seeking declaratory relief regarding alleged violations of a federal law concerning the provision of health services to Alaska Natives.

The Alaska Native Tribal Health Consortium ("ANTHC") is an intertribal consortium created by Congress pursuant to Section 325 of the Department of the Interior and Related Agencies Appropriations Act of 1998 to provide certain statewide health services at the Alaska Native Medical Center in Anchorage.  Plaintiff Southcentral Foundation ("SCF"), a nonprofit regional tribal health organization, is a participant in ANTHC.  SCF sued ANTHC for alleged violations of Section 325 in (1) forming an Executive Committee and delegating to it the full authority of the ANTHC Board of Directors; and (2) erecting informational barriers in a Code of Conduct and Disclosure Policy.

The panel held that SCF alleged an injury in fact sufficient to confer Article III standing by alleging infringement of its governance and participation rights under

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Section 325, as well as deprivation of its ability to exercise these rights intelligently and effectively. The panel reversed and remanded for further proceedings.

## COUNSEL

William D. Temko (argued), Munger Tolles & Olson LLP, Los Angeles, California; Nicholas D. Fram, Munger Tolles & Olson LLP, San Francisco, California; Jahna M. Lindemuth, Holmes Weddle & Barcott, Anchorage, Alaska; for Plaintiff-Appellant.

James E. Torgerson (argued), Stoel Rives LLP, Anchorage, Alaska; Brad S. Daniels and Rachel C. Lee, Stoel Rives LLP, Portland, Oregon; for Defendant-Appellee.

## ORDER

The Opinion filed on September 14, 2020, is amended as set out in the attached Amended Opinion.

With the amendment, the panel has voted to deny the petition for panel rehearing. Judges Gould and Murguia vote to deny the petition for rehearing en banc and Judge Bea so recommends.

The full court has been advised of the petition for rehearing and rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are **DENIED** (Doc. 99). No further petitions shall be entertained.

**OPINION**

MURGUIA, Circuit Judge:

This case asks us to determine whether a tribal health organization has alleged an injury in fact sufficient to confer Article III standing to challenge alleged violations of a federal law concerning the provision of health services to Alaska Natives.

The Alaska Native Tribal Health Consortium ("ANTHC") is an intertribal consortium specifically created by Congress pursuant to Section 325 of the Department of the Interior and Related Agencies Appropriation Act of 1998, Pub. L. No. 105-83, 111 Stat. 1543, to provide certain statewide health services at the Alaska Native Medical Center in Anchorage, Alaska. Southcentral Foundation ("SCF")—a nonprofit regional tribal health organization that provides health care programs and services to over 65,000 Alaska Natives—is a participant in the intertribal consortium.

SCF appeals the district court's dismissal of its complaint against ANTHC for alleged violations of Section 325. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## I.  Background of Section 325

Until the 1970s, the federal government administered health care programs and provided health services directly to Alaska Natives and American Indians through the Indian Health Service ("IHS"), an agency within the Department of Health and Human Services ("DHHS"). Thereafter, federal policy shifted towards empowering tribes and tribal organizations to manage and operate federal programs

offered for the benefit of Alaska Natives and American Indians. *See* 25 U.S.C. § 5301. With that goal in mind, Congress passed the Indian Self-Determination and Education Assistance Act of 1975 ("ISDEAA") to promote a "meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." *Id.* § 5302. In other words, the ISDEAA provides Indian tribes with the authority, discretion, and funds to administer programs that the federal government would otherwise provide.

In the mid-1990s, IHS began constructing a new Alaska Native Medical Center ("ANMC") building in Anchorage to serve Alaska Natives around the state. IHS planned to transfer control of the ANMC to Alaska tribal entities, but over 200 Alaska tribes and tribal organizations could not agree on a management structure. To break the deadlock, Congress enacted Section 325 in 1997, which created an intertribal consortium "to provide all statewide health services provided by the [IHS] of the [DHHS] through the Alaska Native Medical Center and the Alaska Area Office." Pub. L. No. 105-83, § 325, 111 Stat. 1543, 1597 (1997).

Section 325 outlines the formation and governance of the consortium in the following key terms:

> (a) Notwithstanding any other provision of law, and except as provided in this section, [thirteen regional tribal health organizations, including Southcentral Foundation] . . . *are authorized to form a consortium (hereinafter "the Consortium") to enter into contracts, compacts, or funding agreements . . . to*

*provide all statewide health services provided by the [IHS] of the [DHHS] through the [ANMC] and the Alaska Area Office.* Each specified "regional health entity" shall maintain that status for purposes of participating in the Consortium only so long as it operates a regional health program for the [IHS] under Public Law 93-638 (25 U.S.C. 450 et seq.), as amended.

(b) *The Consortium shall be governed by a 15-member Board of Directors, which shall be composed of one representative of each regional health entity listed in subsection (a) above*, and two additional persons who shall represent Indian tribes, as defined in 25 U.S.C. 450b(e), and sub-regional tribal organizations which operate health programs not affiliated with the regional health entities listed above and Indian tribes not receiving health services from any tribal, regional or sub-regional health provider. *Each member of the Board of Directors shall be entitled to cast one vote. Decisions of the Board of Directors shall be made by consensus whenever possible, and by majority vote in the event that no consensus can be reached.*

*Id.*, 111 Stat. at 1597–98 (emphases added).

ANTHC was established as the statutorily-authorized Consortium to provide statewide health services under Section 325 shortly after its enactment. ANTHC's Board of Directors (the "Board") held its first meeting in January 1998 and concurrently adopted its original bylaws (the "Bylaws").

## II.  Factual Background

Many of the following facts are alleged in SCF's complaint, which we presume to be true on this appeal.  *See Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013).

### A.  ANTHC's Executive Committee

In November 2014, the chair and president of ANTHC's Board of Directors, Andy Teuber, sent an email to the Board stating that it would consider certain amendments to the Bylaws at the Board's meeting in December 2014.

At the meeting, the Board—by a thirteen-to-two vote and over the objection of SCF's representative on the Board—adopted an amendment proposed by Teuber that resulted in the creation of a five-member "Executive Committee" of the Board.  The Executive Committee was to be comprised of the Chair of the Board, and two or more additional Directors appointed by the Chair.  The Executive Committee was authorized to "exercise the authority of the Board of Directors in the management of the Consortium," subject to a few narrow exceptions.  Importantly, actions taken by the newly created Executive Committee were not subject to ratification by the full Board.  Furthermore, the Executive Committee's authority was not limited to acting between Board meetings or in emergency situations.

At the December 2014 meeting, Teuber also proposed an evaluation of the compensation paid to the Directors, which included the development of a plan to increase their compensation retroactive to incorporation, despite the fact that between 1999 and 2011 the Articles of Incorporation did not permit Directors to receive compensation for their service on the Board.  Notably, this proposal followed a

settlement between ANTHC and IHS in June 2014, wherein IHS provided ANTHC a one-time payment of $153 million because of failures to pay certain contract obligations.

Shortly thereafter, the Executive Committee met for the first time. Neither SCF's primary Director, nor its alternate, were members of the Executive Committee. The Executive Committee approved lucrative employment contracts for two senior executives of ANTHC—Teuber and CEO Roald Helgesen. Notably, Teuber's base salary increased from $110,000 to $730,000.

Meanwhile, SCF's designated Director was not informed that the Executive Committee had even met until Teuber summarized the results of the meeting in an email in February 2015. Although the email disclosed the execution of new contracts for Teuber and Helgesen, it did not disclose the terms of the contracts, including the compensation amount.

Then, in April 2015, the Board held a special meeting during which it ratified the actions taken by the Executive Committee in December 2014. According to SCF, by this time Teuber's and Helgesen's new contracts had already been signed.

Approximately two years later, in April 2017, the Board amended the Bylaws to clarify that, moving forward, the Executive Committee could convene only between meetings of the Board and that "all actions of the Executive Committee must be ratified and approved by a vote of the Board of Directors . . . in order to be effective."

### B. ANTHC's Code of Conduct and Disclosure Policy

A couple of years after the Executive Committee was created, the Board amended its code of conduct (the "Code of Conduct") "to clarify expectations and processes regarding handling conflicts of interest and confidential information." According to SCF, these changes clarified that Directors could share with their designating entities certain information such as Board resolutions and final meeting minutes, but they stopped short of permitting full disclosure of Board material. In order to share any "confidential or sensitive" information with their designating entity, Directors needed the permission of Teuber or the Chair of the Ethics and Compliance Committee.

The Board also adopted a Disclosure of Records and Information Policy (the "Disclosure Policy") in September 2016. According to SCF, the Disclosure Policy further restricted the information that ANTHC could share with the regional health entities and their designated Directors on the Board by "drastically limit[ing] Directors' access to what ANTHC considered to be '[c]onfidential, proprietary, and other sensitive information.'" Specifically, the Disclosure Policy provided that Directors may "make reasonable inquiries to fulfill their fiduciary responsibilities, including their duty of representation," but that the "disclosure of confidential, sensitive, proprietary or privileged information may be conditioned on adequate safeguards and assurances." The Policy stated that "[o]rdinarily, requests are unreasonable to the extent they are unduly burdensome; likely to disrupt operations; . . . or otherwise inconsistent with the scope of a Director's responsibilities." The Disclosure Policy also provided that "[c]onfidential, proprietary and other sensitive information may also be

provided to Directors and other individuals, organizations and agencies in appropriate cases if adequate safeguards are in place to protect the integrity, confidentiality and use of the information[.]"

In other words, according to SCF, the Disclosure Policy gave unidentified ANTHC personnel absolute discretion to determine what information could be shared, even with ANHC's Directors, with a rebuttable presumption against disclosure.

## III.      Procedural Background

On January 20, 2017, SCF filed suit seeking a declaration that ANTHC violated Section 325 when it: (1) formed the Executive Committee and delegated to it the full authority of the fifteen-member Board, and (2) erected informational barriers in the Code of Conduct and Disclosure Policy.  ANTHC filed counterclaims seeking a declaration that these disputed practices did not violate state or federal law.  In August 2017, the parties filed cross-motions for summary judgment, and ANTHC also moved to dismiss the complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1).  The district court granted ANTHC's motion to dismiss after concluding that SCF failed to allege an injury in fact sufficient to confer Article III standing.  The court therefore denied as moot the parties' cross-motions for summary judgment.  SCF timely appealed.

## IV.     Standard of Review

We review de novo an order granting a motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and construe all material allegations of fact in the complaint in favor of the plaintiff.  *Mont. Shooting Sports Ass'n*, 727 F.3d at 979.

## V.  Analysis

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To have Article III standing, a plaintiff must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61).  Here, the only element of the standing inquiry at issue is injury in fact.

"[A]n injury in fact must be both concrete and particularized."  *Id*. at 1548.  To be particularized, an injury must "affect the plaintiff in a personal and individual way."  *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1).  "Thus, a plaintiff normally does not have standing where the only 'asserted harm is a "generalized grievance" shared in substantially equal measure by all or a large class of citizens.'"  *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  To be concrete, an injury "must be '*de facto*'; that is, it must actually exist."  *Spokeo*, 136 S. Ct. at 1548.  In other words, an abstract, theoretical concern does not suffice.  However, "[a]lthough tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete."  *Id.* at 1549.

SCF alleges an injury in fact in two distinct ways:  first, that ANTHC infringed SCF's governance and participation rights under Section 325 by delegating the full authority of the fifteen-member Board to the five-person Executive Committee; and second, that ANTHC erected informational barriers in the Code of Conduct and Disclosure Policy that deprived SCF of its ability to exercise effectively its

governance and participation rights.  We address each claim in turn.

## A.  Standing for Executive Committee Claim

To determine whether SCF has standing to bring its claim for a declaratory judgment that the formation of the Executive Committee violated federal law (the "Executive Committee Claim"), we begin our analysis with the plain language of Section 325.  *See United States v. Gallegos*, 613 F.3d 1211, 1214 (9th Cir. 2010) ("The starting point for our interpretation of a statute is always its language.").

In no uncertain terms, Section 325 provides that the "[t]he Consortium shall be governed by a 15-member Board of Directors, which shall be composed of one representative of each regional health entity listed in subsection (a) above[.]"  Pub. L. No. 105-83, § 325(b).  In addition, Section 325 expressly identifies thirteen regional health entities that shall be represented on the Board, including SCF.  *Id.* § 325(a).  Section 325 also guarantees that "[e]ach member of the Board of Directors shall be entitled to cast one vote," provided that the regional health entities maintain their status as such by operating a regional health program. *Id.* § 325(a)–(b).

Based on this language, we have no difficulty concluding that SCF has met its burden to demonstrate that the injury it asserts—infringement of its governance and participation rights under Section 325—is sufficiently concrete and particularized.  It is clear that the alleged injury is sufficiently particularized, as Section 325 allocates the right to govern the statutorily-authorized Consortium to a Board of Directors that *expressly* includes a representative from SCF.  It is also clear that the alleged injury is sufficiently concrete.  SCF alleged that the creation of the Executive

Committee, and the delegation to it the full powers of the Board, infringed on SCF's right under Section 325(b) to cast its vote in the management of the Consortium, thereby depriving SCF of the ability to effectuate the "meaningful Indian self-determination" envisioned by Congress when it enacted the ISDEAA.  25 U.S.C. § 5302; *cf. Lapidus v. Hecht*, 232 F.3d 679, 683 (9th Cir. 2000) (shareholders had standing under Massachusetts law to bring direct action for violation of their voting rights).

We are not persuaded by ANTHC's argument that SCF's right to "participat[e] in the Consortium" referenced in Section 325(a) pertains only to SCF's right to participate in the Consortium's "provi[sion of] all statewide health services."  The clause in Section 325(a) referring to the "provi[sion of] all statewide health services" merely describes the types of "contracts, compacts, or funding agreements" that the Consortium is permitted to enter into; it does not limit the scope of the regional health entities' right to "participat[e] in the Consortium."  Rather, the clause in Section 325(a) regarding the regional health entities' right to "participat[e] in the Consortium" relates to preserving each regional health entity's status as such in order to serve on the Board of Directors.  In other words, so long as the regional health entities operate a regional health program, they can be represented on the Board to "participat[e] in the Consortium."

Nor are we persuaded by ANTHC's argument that Section 325 grants rights of governance *only* to Directors. ANTHC highlights that Section 325(b) references *persons* specifically—as opposed to entities—when it mandates that ANTHC "shall be governed by a 15-member Board of Directors, which shall be composed of one representative of each regional health entity . . . and two additional persons

who shall represent Indian tribes." Pub. L. No. 105-83, § 325(b). Had Congress intended that the regional health entities exercise governance rights themselves, ANTHC argues, Congress would have specified how to allocate decision-making power among the regional health entities.

But Congress did just that when it created the right to have a "representative" on the Board. A representative is "[s]omeone who stands for or acts on behalf of another." *Representative*, *Black's Law* Dictionary (11th ed. 2019). "The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there." *Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019) (quoting *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1180 (9th Cir. 2013)). Had Congress meant, for instance, that regional health entities were merely "advisory," it could have used this alternate language. Instead, Congress endowed each specified regional health entity with the right to have a "representative" on the Board that stands in the shoes of the designating entity by acting on its behalf.

We briefly pause to note that ANTHC does not meet its "heavy burden" to establish mootness by virtue of the subsequent Bylaws amendment. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). ANTHC argues that, after the Bylaws were amended in April 2017 to require Executive Committee actions to be ratified by the full Board to be effective, there is no reasonable likelihood that the alleged violation will recur. We have explained that "the mere cessation of illegal activity in response to pending litigation does not moot a case, unless the party alleging mootness can show that the 'allegedly wrongful behavior could not reasonably be expected to recur.'" *Rosemere Neighborhood Ass'n v. U.S.*

*Envtl. Prot. Agency*, 581 F.3d 1169, 1173 (9th Cir. 2009) (quoting *Friends of the Earth*, 528 U.S. at 189). Here, however, ANTHC does little more than point to the fact of the April 2017 amendment as evidence of mootness, which does little to assure that the amendment is not merely "a temporary policy that . . . will [be] refute[d] once this litigation is concluded." *Smith v. Univ. of Wash. Law School*, 233 F.3d 1188, 1194 (9th Cir. 2000) (quoting *White v. Lee*, 227 F.3d 1214, 1244 (9th Cir. 2000)). This is especially true where ANTHC is not entitled to a presumption of good faith that its cessation of the disputed conduct will not recur. As we recently explained, the voluntary cessation of challenged acts by a private party is not entitled to the presumption of good faith enjoyed by legislative bodies when they repeal or amend a challenged legislative provision. *Bd. of Trs. of the Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc). Therefore, without more, ANTHC has not met its burden to establish mootness.

In sum, while we express no views on the merits of SCF's claim that the formation of the Executive Committee violated Section 325, we conclude that Section 325 granted SCF governance and participation rights in the management of ANTHC to be exercised through SCF's representative on the Board and that SCF has alleged an injury in fact sufficient to confer Article III standing to bring its claim.

## B. Standing for Information Claim

Relatedly, SCF argues that it suffered an injury when ANTHC amended the Code of Conduct and adopted the Disclosure Policy, which together deprived SCF of its ability to exercise its governance rights intelligently and effectively by prohibiting SCF's Director from sharing certain critical information with SCF.

Consistent with our foregoing conclusion that SCF has standing to bring its Executive Committee Claim, we likewise agree that the alleged deprivation of information necessary to exercise effectively the governance and participation rights allocated to the regional health entities in Section 325 constitutes an injury in fact sufficient to confer Article III standing. Indeed, the right to govern would be a hollow promise absent the information necessary to exercise that right intelligently.

ANTHC relies on *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010), however, to argue that because Section 325 does not create an *express* right to information, SCF cannot establish standing as to this claim. That argument is unavailing. In *Wilderness Society*, environmental groups argued that they had standing to challenge various regulations issued by the United States Forest Service that "significantly limit[ed] the scope and availability of notice, comment, and appeals procedures" for proposed decisions concerning projects under the Forest Service Decisionmaking and Appeals Reform Act ("ARA"), thereby allegedly causing the environmental groups an "informational injury." *Id.* at 1253, 1258–59. We observed that in order "[t]o ground a claim to standing on an informational injury, the ARA must grant a right to information capable of supporting a lawsuit." *Id.* at 1259. We concluded that plaintiffs failed to assert an informational injury because "Congress's *purpose* in mandating notice in the context of the ARA was not to disclose information, but rather to allow the public opportunity to comment on the proposals." *Id.* at 1259.

ANTHC argues that because the purpose of Section 325 was to allow participation in decision-making—not to provide information—SCF does not have standing to assert

an informational injury, even if information may act "as a predicate" for participation in decision-making.  However, unlike the plaintiffs in *Wilderness Society*, SCF alleges an informational injury that is inextricably tied to its interest in exercising its *governance and participation* rights, not merely the right to participate in the public comment process.  *Cf. Lapidus*, 232 F.3d at 683 (shareholders had standing under Massachusetts law to bring direct action for violation of their voting rights).  This is a meaningful difference in kind.  Accordingly, we conclude that SCF has demonstrated injury in fact sufficient to confer Article III standing to bring its informational injury claim.

## VI.    Conclusion

Because we conclude that Section 325 conferred governance and participation rights to SCF, which necessarily includes an entitlement to information necessary to effectively exercise those rights, we reverse the district court's dismissal of SCF's complaint for lack of Article III standing and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.  Defendant-Appellee must bear all costs.**